# NOWERS v. OAKDEN et al.

No. 6799. Decided May 16, 1946. (169 P. 2d 108.)

28

See 3 C. J. S., Animals, sec. 185; 50 Am. Jur. 449. Basis for computing majority essential to the adoption of special proposition submitted to voters, note 131 A. L. R. 1382; see, also, 18 Am. Jur. 340.

*Rawlings, Wallace & Black* and *Howard F. Coray,* all of Salt Lake City, for appellants.

*Cline, Wilson & Cline,* of Milford, for respondent.

McDONOUGH, Justice.

This is an appeal on the judgment roll of a decision of the District Court in and for Beaver County.

The defendants' cattle trespassed on land owned by the plaintiff doing damage thereon to the amount of $180. The land in question was not enclosed by a "lawful fence," as defined by an alleged ordinance of Beaver County hereinafter discussed. The trespass of the cattle was not intentional on the part of the defendants. The plaintiff sued defendants basing his cause of action on Section 3-5-79, U. C. A. 1943. This section and the two preceding sections of the statute are as follows:

"Section 3-5-77. Local Fence Laws. Any county or precinct thereof at any general or special election called for that purpose by the board of county commissioners may by a vote of the majority of all the legal voters of such county or precinct declare in favor of fencing farms and allowing domestic animals to run at large; and in such cases the provisions of this article authorizing the detention and sale of animals for damages shall be inoperative.

"Section 3-5-78. Lawful Fence. It shall be the duty of the board of county commissioners to declare by ordinance what shall constitute a lawful fence for that county.

"Section 3-5-79. Trespassing Animals—Damage For. If any neat cattle, * * * shall trespass or do damage upon the premises of any person, *except in cases where such premises are not inclosed by a lawful fence in counties where a fence is required by law*, the party aggrieved, * * * may recover damages by a civil action against the owner of the trespassing animals or by distraining and impounding such animals in the manner provided herein; provided, that in cases where an action is brought for the recovery of such damages none of the animals trespassing shall be exempt from execution; and the fees in such cases shall be but one-half the fees in other civil actions." (Emphasis added.)

The defendants' principal defense is that by Ordinance No. 1B of 51 of the Ordinances of Beaver County passed by the Board of County Commissioners of Beaver County on the 6th day of April, 1915, by a special election held pursuant thereto and by an entry made in the minutes of a meeting of the Board of County Commissioners of Beaver County on or about the 4th day of May, 1915, a local fencing law became effective on and after August 1st, 1915; and inasmuch as plaintiff's land was not enclosed by a lawful fence he is precluded from recovery.

The district court sitting without a jury awarded damages as noted hereinabove. The conclusions of law made by the trial court which are assigned as error by the appellants are:

"1. That no valid fence law was enacted or established for Beaver County.

* * * * * *

"3. That the plaintiff is entitled to recover from the defendants and each of them damages * * ,*."

The plaintiff (respondent here) by cross-assignment of error contends that Section 18, Compiled Laws of Utah 1907, now Sec. 3-5-77, U. C. A. 1943, quoted above, in force in 1915 when the local fence law was attempted to be enacted, is so vague, indefinite, uncertain and ambiguous in its terms that it is invalid; and that a local fence law attempted to be passed thereunder would not render inoperative the statutory right given in Section 20, Compiled Laws of Utah 1907, Section 3-5-79, supra, to recover damages.

The two problems presented in this case are:

1. Is Section 18, Compiled Laws of Utah 1907, so vague, indefinite, uncertain and ambiguous in its terms that it is invalid?

2. If Section 18, supra, is declared to be valid, did the action taken pursuant thereto by the Beaver County Commissioners, plus the special election there held and the entry in the Commission minute book on or about the 4th of May, 1915, enact a valid fence law for Beaver County?

We address ourselves to the first question. It is a well settled rule that courts will not attempt to enforce legislative acts that are so vague that the meaning of the legislature cannot be understood therefrom. As stated by the Alabama court in *Carter* v. *State*, 243 Ala. 575, 11 So. 2d 764:

"An act to have effect of 'law' must be intelligibly expressed, an act conveying no definite meaning to those whose duty it is to execute it is inoperative."

It is not the province of courts to substitute what they think ought to be the law for the ambiguous or indefinite terms of the legislature. Rather the court should declare such an uncertain act invalid and leave to the legislature the task of clarifying the enactment.

This does not mean, however, that an act of the legislature otherwise valid will be declared inoperative merely because it is difficult to understand or because it could have been expressed more clearly if other phraseology had been used. As stated by the Arizona court in *Coggins* v. *Ely*, 23 Ariz. 155, 202 P. 391:

"A court will not declare a law void for uncertainty or ambiguity unless, after using every authorized means to ascertain and give the act an intelligible meaning, it is found impossible to clear up the doubt and dissolve the obscurity."

Does Section 18, Compiled Laws of Utah 1907, when construed with related sections, convey a definite meaning to "those whose duty it is to execute it," i. e. county commissioners?

Section 19, Sec. 3-5-78, U. C. A. 1943, expressly gives county commissioners the power to declare by ordinance what shall constitute a lawful fence. Section 18 expressly gives county commissioners power to call a special election so that the legal voters of the county may vote for or against the proposition of fencing real estate and allowing domestic animals to run at large. Section 18 impliedly gives the county commissioners authority to set up the necessary election machinery consistent with existent constitutional and statutory provisions governing such elections. Sec. 50, Am. Juris Title Statutes Sec. 428, and *Cabell* v. *City of Cottage Grove,* 170 Or. 256, 130 P. 2d 1013, at p. 1020, 144 A. L. R. 286.

Plaintiff cites the case of *Hettinger* v. *Good Road Dist., etc.,* 19 Idaho 313, 113 P. 721, 724. In that case a section of the Idaho Code authorized the Good Road Commissioners

"with the consent of a two-thirds majority of the qualified electors at their respective districts, voting at any election held for the purpose of issuing bonds, to issue bonds   *   *   *." Rev. Codes 1905, § 1054.

The Idaho court stated:

"This section, however, makes no provision for any notice of election or the manner of conducting the same,   *   *   *   or how, or in what manner, or by whom such election shall be held.   *   *   *   In fact, there is no method provided in section 1054, or in any other part of the act, which provides for the method or the machinery for carrying out and executing this section. The section, therefore, is uncertain, indefinite, and incapable of execution, and is invalid and of no force or effect."

The Hettinger case is clearly distinguished from the case at bar as the county commissioners are here designated as the body to call the election and to them, as noted hereinabove, has impliedly been delegated the task of setting up the rules for the special election.

Also cited by the plaintiff is *Cook* v. *State*, 137 Ga. 486, 73 S. E. 672, 673. In that case a Georgia statute contained the provision:

"Provided, the provisions of this act shall become of full force and effect only when ratified by a majority of the votes cast by the qualified voters of Baker county at an election to be held for the purpose of submitting the provisions of this act to the qualified voters of Baker county for their approval, which said election shall be held on the same date as the general election   *   *   *." Act 1910, p. 201.

The Georgia court held that the act was nugatory and ineffectual because it fails to provide how the election therein mentioned

"shall be held, who shall hold it, and to whom the returns of the election shall be made   *   *   *."

But the Georgia court distinguishes the case from those where the act under consideration authorizes a mayor or county commission to call the election, and intimated that had the act in the Cook case conferred any powers on the

board of commissioners the result in the Cook case would have been contrary to that there reached.

The Georgia court cited, and we cite here, the case of *Jacoby* v. *Dallis*, 115 Ga. 272, 41 S. E. 611. The question was there raised as to the validity of an act to establish a dispensary in LaGrange. The act provided:

"Within twenty days after the passage of this Act the mayor of the city of LaGrange shall order an election, at which shall be submitted the question of 'dispensary,' or 'no dispensary.' Those voting for dispensary shall have written or printed upon their ballots, 'For dis-dispensary,' and those voting against dispensary shall have printed or written upon their ballots, 'Against dispensary.' Should the result be in favor or for a dispensary, then said dispensary shall be established in accordance with the provisions of this Act." Acts 1901, pp. 509, 510.

The act was attacked because it failed to specifically prescribe the "way for holding" the election, and because it "makes no provision for the necessary rules and regulations" with respect thereto. The court held:

"It is true that the act does not undertake to declare how notice of the election therein provided for shall be given, or to prescribe the precise manner in which it shall be held; but we do not think it was indispensably necessary that the general assembly should have specifically dealt with these matters of mere detail. On the contrary, the act can, in our opinion, be upheld and given effect by construing its provisions as to the holding of an election to mean that the mayor of the city, who was expressly authorized to fix the time for the holding thereof, should also have power to make his order effectual by making the necessary provisions for the holding of an election in the usual and proper way in which such elections as that contemplated by the general assembly are conducted in this State."

Plaintiff cites the case of *Knight* v. *Trigg*, 16 Idaho 256, 100 P. 1060, 1062, as follows:

"The holding of elections is peculiarly and wholly a matter within the management and control of the political department of government * * *, and, in order for the ministerial officers to hold and conduct an election, it is necessary that the legislative branch prescribe the manner and method and designate the procedure to be followed; otherwise, the ministerial officers would be involved in uncertainty and

doubt, and would necessarily have to assume quasi legislative functions in order to hold the election."

The act involved in the Knight case provided for the governor of the state to call the election and designated certain ministerial officers to carry out some of its provisions. It is to be noted that in the instant case authority is conferred on the county commissioners █ of a county to call the election for the purpose specified in the statute. County commissioners are legislative as well as executive bodies. The delegation of legislative or quasi legislative powers to such a body could not be questioned as it evidently was as to certain ministerial officers in the Idaho case.

The plaintiff contends that Section 18 is invalid for the further reasons that no provision is made for making the local fence law effective and it is uncertain whether the favorable election made the local fence law effective or even made it capable of being made effective. As █ we view the section and other sections on the same subject it was the intent of the legislature to leave to the counties or separate precincts thereof whether or not they should have a fence law. If that were the only intent expressed, the county commissions could enact ordinances relative thereto just as they may relative to other matters concerning which legislative power is vested in them. But the state legislature went further and provided that before a fence law could become effective for a particular county the majority of the legal voters of said county must vote favorably for said law.

The three sections of the statute quoted at the outset must be construed together. Sec. 3-5-78 as originally enacted, Session Laws of Utah 1896, p. 582, provided that it should be the duty of the county commissioners *immediately after the passage* of the act to declare by ordinance █ what shall constitute a lawful fence. Thus there was evidenced a legislative intent that before the voters of the county should be called upon to express, pursuant to Sec.

3-5-77, their will as to the law relative to liability for trespass by animals, they should be advised as to the kind of fence it was proposed be required. The fact that the italicized portions of the section were dropped in the compilation of 1907, Sec. 19, C. L. U. 1907, evidences no intent to change the structure or intent of the statute. The law had then been in force for more than 10 years, and it was evidently assumed that the law had been complied with by the various counties.

The requirements of the law relative to declaring what shall constitute a lawful fence for a particular county being complied with, the voters of such county are authorized by the provisions of Sec. 3-5-77, at a general or special election, to decide to require the erection of a lawful fence as so defined. In such event, the statutory exception expressed in Sec. 3-5-79 would be applicable to such county—that is, where a lawful fence is required by law a person who has not enclosed his premises by such fence may not recover damages against the owner of animals which trespass thereon.

We note here the contention of respondent that the only effect of a vote "in favor of fencing farms and allowing domestic animals to run at large" is that declared by Sec. 3-5-77, viz., that the provisions of the enactments relative to detention and sale of animals for damages shall be inoperative. But such section can be intelligently construed only in connection with the companion sections enacted therewith. The legislative intent is manifest: that upon a "fence law" being put into effect by the action of the voters, not only were the provisions of the chapter dealing with the detention and sale of trespassing animals inoperative in such locality, but the provision of the subsequent section excluding a non-complying landowner from the right, thereby conferred, or recovering damages for trespass, was likewise in such locality applicable.

There is no merit to the argument that the phrase "declare in favor of" as used in Section 18 of this statute means

other than to submit the question to the voters, or to have the question decided or determined by the voters. In this case if the majority of the voters "declare in favor of" a fencing law it would be mandatory that a fencing law go into effect. The section provides for an "election" not for an informal poll of public opinion.

We shall assume without so deciding, in harmony with the contention of plaintiff, that the unique provisions of the fencing statute do not allow a county commission to amend or repeal its local fencing law after said law is once established. Even so, the statute is not thereby rendered invalid. Assuming that the legislature in its wisdom intended that fencing laws once established should not be easily changed and therefore gave to county commissions the conditional power to establish but no power to alter or repeal same after they were once established, we find no basis in such fact for holding the enactment invalid. The power resides in the legislature to change the law in that respect if it be deemed advisable.

We are of the opinion and hold that Section 18, Compiled Laws of Utah 1907, now Section 3-5-77, U. C. A. 1943, is not so vague, indefinite and ambiguous in its terms that it is invalid. Under Section 18 and Section 19, now Section 3-5-78, U. C. A. 1943, for a county to have a local fencing law the following must have been done:

1. The county commission must pass an ordinance declaring what shall be a lawfull fence for that county.

2. In the same or in a subsequent ordinance the commission must call a special election for the purpose of letting the legal voters vote on same and must set up all the rules and regulations consistent with the constitution and laws of Utah for conducting such election; or

2. In the same or in a subsequent ordinance the commission must provide that the question of whether to have a local fence law or not shall be submitted to the voters as a question on the ballot in a general election.

3. Depending on which of (2) above is used the election provided therein must have been held and a majority of the

persons voting must vote in favor of having a local fence law.

We consider the remaining problem—Was there enacted in Beaver County a valid fencing law?

On April 6, 1915, the Board of County Commissioners of Beaver County passed and adopted Ordinance No. 1B No. 51 of the Ordinances of Beaver County as follows:

"An ordinance calling a special election of the qualified voters of Beaver County, for the purpose of voting on the question as to whether the citizens shall fence their farms and premises or not; and defining what shall constitute a lawful fence.

"Sec. 1. Be it ordained by the Board of County Commissioners of the county of Beaver as follows: That there shall be a special election of the qualified electors of the County of Beaver, held on the 4th day of May, 1915, at the various precincts in Beaver County, Utah, for the purpose of determining whether the citizens of the County shall fence their farms, and premises, and allow domestic animals to run at large, and thereby render inoperative the provisions of the Statutes authorizing the detention and sale of animals, as provided by Section 8 [18] Chapter 1, page 136, Compiled Laws of Utah for the year 1907.

"Sec. 2. Said special election shall be held as nearly as possible in conformity with the election laws of the State of Utah, and notice thereof shall be given by publication in the Weekly Press and the Beaver County News for three weeks prior thereto in three successive issues.

"Sec. 3. The ballots for said special election, shall be printed and furnished for the electors at the expense of the county, which said ballots shall be in the following form, to wit:

Fence Yes.                    Fence No.

"The returns of said election shall be made in the manner, and canvassed, and the results declared, as provided by law in cases of general elections."

Sec. 4. (Defines a lawful fence)

The records show that as provided in the above-quoted ordinance a special election was held within Beaver County, Utah, at which ballots were used by the voters as set forth in said ordinance, to wit:

Fence Yes.                    Fence No.

It is an uncontested fact that the Board of County Commissioners met on May 10, 1915, in the statutory manner as a Board of Canvassers and found and declared that 424 legal voters had voted "Fence Yes" and 237 legal voters had voted "Fence No" at said election.

It is also uncontroverted that the minutes of said Board of County Commissioners for May 10, 1915, further recite:

"It is hereby ordered that the fence law go into effect on and after August 1st, 1915."

From the above facts the trial court concluded that no valid fence law was enacted for the following reasons:

(a) The statute relating to local fence laws in effect at the time involved (Section 18, C. L. U. 1907) does not provide any definite procedure for adoption or enactment of a local fence law by the voters nor does it appear to authorize the board of county commissioners to enact an ordinance upon the subject.

(b) The ballot used in the election in Beaver County cannot be considered to have the effect of enacting a fence law nor as authorizing the county commissioners to enact such a law because said ballot didn't comply with the election laws then in force which provided:

"* * * Whenever the approval of a constitutional amendment or other question is submitted to the vote of the people, such question shall be printed on the ballot after the list of candidates. * * *" Section 839, C. L. U. 1907.

(c) The Board of County Commissioners of Beaver County failed to declare and publish either by ordinance or proclamation the result of said special election, or the order of the said Board declaring that the so-called fence law would go into effect on August 1st, 1915, or at any other time or at all.

For the reasons given hereinabove we find no merit in the first reason for the trial court's holding. As to the second reason, it is the opinion of the court that Section 839, C. L. U. 1907, supra, was passed to set up the arrangement and general form of the ballot and that its violation is not here involved. The section deals

with the "make-up" of the ballot; the quality and tint of paper to be used; the size and color of printing; location of party emblems and titles; manner of listing candidates; the size and location of the voting circles and voting squares; size and location and manner of numbering the ballot stub; and related matters, in addition to the quoted sentence dealing with the submission to the voters of a constitutional amendment or other question. It is abundantly clear that in enacting this statute the legislative mind was not at all addressing the problem of how an officer should express on the ballot a proposition to be presented to the voter, but was merely considering where on a ballot containing names of party candidates, such proposition should be printed. So concluding, we shall not undertake to discuss the cases cited to the proposition that where the legislature specifies the form of submission of such propositions, substantial compliance with its directions is mandatory.

There being no general legislative mandate as to how a proposition must be worded on the ballot, and the enactment here under examination being silent on the matter, there remains but to determine whether the proposition to be submitted was, in light of the circumstances of its submission, framed with such clarity as to enable the voters to express their will. The proposition to be voted on must, of course, be placed on the ballot in such words and in such form that the voters are not confused thereby. The ballot together with the immediately surrounding circumstances of the election must be such that a reasonably intelligent voter knows what the question is and where he must mark his ballot in order to indicate his approval or disapproval.

In the instant case a special election was called with, we must assume as it is not controverted, the statutory notice to voters as provided by law for such special elections. The election was called for only one purpose, namely, to have the citizens vote on whether or not they should fence their farms and allow domestic animals to run at large. The special election was held pursuant to

an ordinance which to become effective was published for at least a week (Section 519, C. L. U. 1907) and which specifically provided for the *form* and *wording* of the ballot to be used in said special election. It is the opinion of this court that considering all the surrounding circumstances the ballot used in the case at bar was legally sufficient and that no reasonably intelligent voter was misled thereby as to what he was voting for or against.

We likewise are of the opinion, and so hold, that it was unnecessary for the county commission to publish by ordinance or proclamation the result of the special election. Sections 869 to 873, inclusive, C. L. U. 1907, give the statutory duties of a county commission meeting as a board of county canvassers. As far as the record of this case shows the pertinent duties contained in these sections were complied with. But the argument is made, and the trial court held, that no fence law went into effect because the effective date therefor was never announced by ordinance or resolution of the county commissioners. The contention made is not without substance. Sec. 519, C. L. U. 1907, in force at the time the questioned election was held, provides that no ordinance passed by the board of county commissioners shall take effect within less than fifteen days and that before the expiration of fifteen days such ordinance shall be published for at least one week in some newspaper published in the county, if there be one, and if there is not such a newspaper that it be posted at the court house door for the same period before the effective date. It is evident that the purpose of this section is to give notice to the inhabitants of the county of a change in the law. But it has reference to ordinances passed by the Board. As indicated herein, it was not the intent of the legislature that the board enact an ordinance subsequent to the conduct of the election. On the contrary, it was intended that by their vote the people of the county would adopt or reject the requirement of fencing farms in the manner defined by the board, and thereby make applicable the appropriate provisions of the statutes rela-

tive to trespassing animals. Should it be required, nevertheless, that the enactments thus put into effect be given the notoriety which the statute requires of an ordinance of the board of county commissioners before such became operative? We think not. The legislature did not see fit to make such provision; and we find no declaration of policy sufficiently compelling to read the provision into the legislation. The law required that the ordinance of the board defining a lawful fence be published. It further required that the call for the election be published. The legislature may have thought that these provisions were sufficient to put those affected on inquiry as to the election results, which as we have seen were duly canvassed and the results noted on the public records.

Assuming that after such canvass and recordation of the election results, due process would require that persons affected by the law thus enacted should be given a reasonable time to comply with its provisions, such was accorded them by the action of the board of commissioners in the instant case by the latter declaring the law effective some three months after the date when the election results were disclosed.

A final objection to the election as held in Beaver County is made in plaintiff's brief. He contends that the failure of the Beaver County Commission to provide for and hold registration for the citizens for the special election on the desirability of a fence law is uncontsitutional as many "legal" voters were thus precluded from voting contrary to Article IV, Sec. 2, Constitution of Utah.

Sec. 821, Compiled Laws of Utah 1907, provides:

"No person shall hereafter be permitted to vote at any general, special, municipal, or school election, without first having been registered within the time and in the manner and form required by the provisions of this chapter."

The theory presented is that many citizens who have all the expressed Constitutional requirements for voting at the time of this special election are denied their right to vote

because for some reason they did not previously register, for example, at the previous general election he may not have resided in the county a sufficient length of time but by the time of this special election his residence requirements are filled.

This court said in *Earl* v. *Lewis*, 28 Utah 116, 77 P. 235, 238:

"It is fundamental that a right of a citizen guaranteed by the Constitution cannot be abridged, impaired, or taken away, even by an act of the Legislature. Notwithstanding our Constitution has fixed the qualification of voters, the Legislature may rightfully enact a registration law which merely regulates the exercise of the elective franchise, and does not amount to a denial of the right itself, and does not abridge or impair the same."

Section 818, C. L. U. 1907, provides how the matter of registration will be handled for special elections, to wit:

"Before the day on which any special election is appointed to be held, the registry agent must furnish one of the judges in his election district, at a time not later than one day next preceding the day the election is to be held, a copy of the official register for his district, but no copies need be posted."

Thus the "official register" is used.

Registration for school elections in the state of Utah is handled in the same manner. In fact, Section 816, C. L. U. 1907, in force when the election in the instant case was held, specifically provides:

"* * * For all special and school elections there shall be no special registration of voters, but the 'official register' last made or revised shall constitute the 'official register' for such special or school election."

Sec. 800, C. L. U. 1907, provides that registration agents shall register qualified voters on specified days prior to each general election. General elections are held biennially in even numbered years. Sec. 780, C. L. U. 1907. Thus in this case there intervened the period from the last registration date provided for the general election of 1914 to the holding

of the special election in May, 1915, during which no provision was made for registration of voters. However, we are not confronted with the question of whether the absence of such an opportunity violated the cited constitutional provision when applied to a special election. No showing was made in the court below that non-registered legal voters in sufficient number to change the result, or at all, were deprived of the right to vote at the election in question. Under such state of facts, the election will not be invalidated. See *Ferguson* v. *Allen*, 7 Utah 263, 26 P. 570. In *Carville* v. *McBride*, 45 Nev. 305, 202 P. 802 at 804, the court quotes with approval from 6 Am. and Eng. Ency. 276, the following:

"If a registry is had under an unconstitutional law and an election held upon the basis of such registry, there can be little, if any, doubt that the election will be held valid unless it is shown that a sufficient number of legal voters to have changed the result were prevented by such law from casting their ballot."

The proposition so expressed is sound. The contention of respondent on this point is hence overruled.

Concluding as we do that a valid fence law was enacted by Beaver County and the record disclosing that respondent had not complied therewith and hence is not entitled to recover damages for the unintentional trespass complained of, it follows that the judgment below must be reversed with instructions to the lower court to enter judgment in favor of appellants. Such is the order. Costs to appellants.

WADE and WOLFE, JJ., concur.

LARSON, Chief Justice (dissenting).

I dissent. The statute providing that a fence law may be adopted by a county, or by a precinct requires not only that an election be held, but that the proposition to require a land owner to fence his lands with a fence of a particular type, defined by the county commissioners or to be prohibited from obtaining damages for injuries done by tres-

passing animals running at large, must carry at such election "by a vote of a majority *of all the legal voters of such county* or precinct."

I do not think it was the intention of the legislature that a mere majority of persons voting could deprive a person of a common law, and a statutory right to sue for damages, and to allow one person to trespass at will on the property of another without liability. The provision that it must carry by "a majority of all legal voters of such county" cannot well be construed to mean "of all those voting" because in other provisions of the statute the legislature was careful to use language different from this. Thus in Section 25-7-6 it says "the persons having the highest number of votes" shall be declared elected; and in Section 25-10-20, in the initiative and referendum provisions it declares that such measures carry as has "the greatest number of affirmative votes [if that] is a majority of those voting"; and Section 25-11-4 uses the language "elected by a plurality of votes." Section 15-7-7, providing for issuance of city bonds, reads "a majority of those voting thereon." We shall not prolong this opinion by quoting all the statutory provisions showing the legislature has always been careful in its choice of language in defining what constitutes winning an election. In the fence law act they said *"the majority of all the legal voters of such county."* I think they meant just that.

Another interesting thing is the fact that the county ordinance calling the election states that the election

"is to determine whether the citizens of the county shall fence their farms and premises, and allow domestic animals to run at large, and *thereby render inoperative the provisions of the statutes authorizing detention and sale of animals, as provided by Section* 8 [18] *of Chapter 1,* pg. 136, Compiled Laws of Utah for the year 1907."

It is elemental that the effect of an election cannot be extended beyond the scope and purpose stated in the ordinance calling the election.

I also dissent from the holding that the fence law could go into effect and become operative merely by a date fixed

in the minutes of the County Commissioners, without having designated the effective date in the election ordinance or by a published proclamation.

PRATT, J., not participating.