TYGESEN v. MAGNA WATER CO et al.
(VERNON, Atty. Gen., third party defendant).

No. 7550.   Decided December 28, 1950.   (226 P. 2d 127.)

276

See 20 C. J. S. Counties, sec. 50. Ownership of property as qualification of voter, see note 95 A. L. R. 1099. See, also, 18 Am. Jur. 225 et seq.

*Roy F. Tygesen* Magna, for plaintiff.

*Marvin J. Bertoch, Robert S. Richards,* Salt Lake City, for defendants.

*Clinton D. Vernon,* Atty. Gen., third party defendant.

WADE, Justice.

This is an original proceeding in this court brought by the plaintiff to obtain a writ prohibiting the defendants from issuing and selling general obligation bonds of the District in the amount of $75,000 and issuing revenue bonds in the amount of $175,000. The Attorney General of the State of Utah has been made a third party defendant because one of the purposes of plaintiff's action is to attack the constitutionality of Chapter 24, Laws of Utah 1949, by the authority of which statute The Magna Water Co., an Improvement District, was established.

Chapter 24, Laws of Utah 1949, authorizes the Board of County Commissioners in each county in the state to establish improvement districts for the purpose of operating systems for the supply, treatment and distribution of water and systems for the collection, treatment and disposition of sewage. Under the authority of this Act the Magna Improvement District was formed. This improvement district is located in Magna, Utah, an unincorporated town, and is entirely within the boundaries of Salt Lake County, and plaintiff admits that the creation of such district was made in accordance with the requirements of the Act and the bond election which authorized the Board of Trustees of the Magna Water Co. to issue the bonds, was duly and regularly conducted in accordance with the requirements of the Act. Plaintiff also admits that the facilities in the Magna area for the supply of water are perilously inadequate to meet the needs of its citizens and is such as to cause the retardation of the building of needed new homes in the area as well as being a present menace to the health of the community. The lack of a reserve water supply has also proven to be a dangerous fire hazard.

Plaintiff asserts that Chap. 24, Laws of Utah 1949, violates the provisions of Art. VI, Sec. 29, and Article XI, Sec. 5 of the Constitution of Utah, because it delegates

"to a special commission, private corporation or association power to assume,

supervise or interfere with municipal functions, and has by special law created a corporation for municipal purposes."

Sec. 29, of Art. VI of the Constitution of Utah provides that:

"The Legislature shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, to levy taxes, to select a capitol site, or to perform any municipal functions."

Section 5 of Article XI, Constitution of Utah, among other things provides that:

"Corporations for municipal purposes shall not be created by special laws. * * * *"

It is plaintiff's contention that since under present day conditions counties have assumed in unincorporated cities or towns many of the functions of the incorporated cities or towns, such as regulating police and fire protection, lighting streets, collecting garbage, surfacing and clearing streets and sidewalks and operating sewers, that the functions of the counties are municipal functions the same as that of incorporated cities and towns and therefore the provisions of Art. VI, Sec. 29, forbidding the legislature to delegate to special commissions, private corporations or associations the power to perform municipal functions applies to the functions which the counties have assumed.

Assuming, without conceding, that the term "municipal functions" as used in Art. VI, Sec. 29, applies to the functions of counties as well as cities and towns, nevertheless, plaintiff's contention is not tenable. The management and control of the Improvement Districts and its properties and effects are used by the Act vested in a Board of Trustees even though these districts are initiated by the county commission. Their operations will be separate and distinct from any of the functions assumed by the counties in those unincorporated cities or towns. Although these operations might be in the same territorial

boundaries as the improvement districts, they will have no control over the property or effects of the counties or of the manner of the performance of any of the functions which the counties have assumed. These improvement districts are similar to the Metropolitan Water Districts and the Water Conservancy Districts. In the Metropolitan Water District Act the initiating agencies were the legislative bodies of the cities desiring the districts, in the Water Conservancy Act the district courts upon petition of a specified percentage of property owners were the agencies through which the districts could be established, whereas in the Improvement District Act under consideration the Legislature has seen fit to give that duty to the county commissioners of the counties in which it is desired to establish a district. In all of these acts once the initiating agencies have acted and a district has been formed, their functions cease and the governing body of the district assumes full control of the district and its properties. This court has held that the Metropolitan Water Districts and the Water Conservancy Districts organized under those Acts were separate and distinct arms of the government and not special commissions, boards, private corporations or associations within the purview of the constitutional prohibition. See *Lehi City v. Meiling, City Recorder*, 87 Utah 237, 48 P. 2d 530 and *Patterick* v. *Carbon Water Conservancy District*, 106 Utah 55, 145 P. 2d 503. The fact that proceedings to initiate an Improvement District is left to the county commissioners of the counties in which the Districts can be formed might lend some support to an argument that a district would not be a separate and distinct arm of the government but merely be an arm of a county for the purpose of carrying out a county function, were it not for the fact that once the District is actually organized the county has no further connection with the District except the ministerial one of levying any taxes certified to it by the Board of Trustees, a duty of the county which is similar to that

performed by it for Boards of Education under the provisions of Sec. 75—12—10, U. C. A. 1943. Once the District is formed the Board of Trustees have full control and supervision of the property and the conduct of affairs of the District. The District must have its own seal and its Board of Trustees may sue and be sued. Also the taxes which are certified by the Board to the county commissioners can be levied only on property within the District. If a District were merely an arm of the county then the general taxes levied whether used for benefits inuring to the District or not should be levied against all residents of the county rather than on those only within the District, just as they are for other county functions. It being the duty of this court, where possible, to uphold the validity of an act rather than declare it unconstitutional, see *Lehi City* v. *Meiling, City Recorder,* supra, and *Patterick* v. *Carbon Water Conservancy District,* supra, we are of the opinion that an Improvement District is a separate arm of the government and not a mere adjunct of a county performing county functions.

Since an improvement district created under Chap. 24, Laws of Utah 1949 is not a corporation but is a separate arm of the government formed for public purposes, it does not violate Sec. 5 of Art. XI of the Utah State Constitution forbidding the creation of corporations for municipal purposes, by special laws. See *Patterick* v. *Carbon Water Conservancy District,* supra, wherein this court held that the inhibitions of Sec. 5, Art. XI applied only to cities, towns, villages and subdivisions of these but did not apply to an arm of the government separate and distinct from a municipality, such as this improvement district is. Another good reason why the Improvement District Act does not offend against this constitutional provision is that the Act is not a special but a general law because it applies alike to all portions of the state and is made for the use and benefit of the inhabitants of all counties

which come within and might desire to take advantage of its provisions.

Plaintiff next contends that the Act violates Art. V of our Constitution, because many of its provisions are so vague and uncertain that it will require of the courts interpretation to such an extent as to amount to making the law, which is a function given by this constitutional article to the legislature and not to the courts. In support of this contention plaintiff gives a number of provisions of the Act as examples of such vagueness and uncertainty. It would unduly and unnecessarily lengthen this opinion to take each of his examples and show where he is mistaken in such contention. Suffice it to say that we have carefully examined and considered each of his examples and find that they do not offend Art. V in this respect. It is the duty of courts to interpret and construe statutes, and only where the statute is so vague that the meaning of the legislature cannot be ascertained or understood therefrom will they refuse to enforce an act. They will not substitute what they think ought to be the law for ambiguous terms in the act, nor will they declare an Act invalid because it has not been expressed as aptly or clearly as it could have been had different terms been used. Instead the courts will use every authorized means to discover and give an Act an intelligible meaning. Only when it is impossible to resolve the doubts will an Act be declared invalid for uncertainty or vagueness. See *Nowers* v. *Oakden,* 110 Utah 25, 169 P.2d 108. In the examples given by plaintiff, this court has no doubt that it will not be too difficult for the courts to ascertain the meaning of the legislature.

Plaintiff avers that the Act limits or prohibits review by the courts and therefore violates Sections 7 and 11 of Art. 1 of our state constitution. Sec. 7 provides that: "No person shall be deprived of life, liberty or property, without due process of law."; and Section 11 provides: "All courts shall be open, and every person, for an

injury done to him in his person, property or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this State, by himself or counsel, any civil cause to which he is a party."

Plaintiff argues that the Act gives the trustees of the District and the County Commissioners extensive powers but does not provide for a review by the courts of their actions, but in some instances limits and prohibits such review and in so doing violates the above constitutional provisions. Plaintiff refers us to portions of Sections 3, 5, 8, 10 and 14, of the Act, the provisions of which he contends are examples of such limitations and prohibition of review by the courts and which therefore violate these constitutional provisions. At the outset it should be kept in mind that this Act was enacted to provide for the creation of Improvement Districts wherever desired in the State, and that these Districts, when formed, are quasi-municipalities, and the benefits to be obtained from such Districts enure to the public generally. There are no provisions in the act for special assessments or liabilities of individuals for benefits which would enure to them as such, but merely as members of the public. The taxes which the Act empowers the District to levy for the payment of the benefits are general taxes and not special assessments. The governmental acts of quasi-municipalities are like those of true municipalities, and when a municipality acts within the powers given it by statute, its acts are not subject to review by courts unless there is a manifest abuse of those powers or unless such right to review is granted by statute. See 62 C. J. S. Municipal Corporations, § 199. This being so, it follows that the provisions of Sec. 11 of Art. 1, of our Constitution are not applicable.

Does the Act offend against Sec. 7, Art. 1, our "due process" clause? Plaintiff argues that the act violates this section because a protestant of the formation of a district has only thirty days in which to file his protest in a district court and then his right of review is limited to whether his property will not be benefited and whether the district was created in compliance with the statute; that at the time this right of review is available to him he cannot know the extent of the proposed improvements and whether or not they would be excessive as Sec. 3 of the Act provides that "The provisions of the petition [for formation of the district] shall not be considered to be a limitation on the right of the board to submit a bond issue in whatever amount and for whatever improvement may be found desirable after the district has been organized." That this provision makes it impossible for a property owner to know before the time for protest is over whether the amount which might eventually be determined to be spent on the improvements is such that had he known it in the first instance would have caused him to protest the formation of the district.

Section 3 of the Act provides in part, that a board of county commissioners which has adopted a resolution to form an improvement district must give notice of such intention. That such notice shall define the area to be included and the boundaries thereof, shall generally describe the proposed improvements with the estimated cost, and such notice shall be published in a newspaper of general circulation in the county once each week for five successive weeks. The notice shall give a time not more than 90 days or less than 45 days after the first publication and a place where all interested parties may appear before the board to be heard either in favor or protest of the proposed district. Any taxpayer may protest in writing the formation of such a district at any time either before or at the time of the hearing. If the owners representing more than one half

of the assessed value of the taxable property within the proposed district protest the formation of such a district, it shall not be formed. If the Board shall determine that the written protests represent less than one half of the assessed valuation of real property in the district, "the resolution of the board establishing the district shall contain a recital to that effect and such recital shall be binding and conclusive for all purposes." After the adoption of this resolution any property owner who has filed a written protest to the establishment of the district and whose property is included therein may within 30 days after such adoption apply to the district court for a review of the actions of the board, but such review shall be only on the ground that his property will not be benefited by the proposed improvements or upon the ground that the proceedings establishing the district have not been in compliance with the statute. A failure to apply for such a writ of review within the time specified shall foreclose any further right to object to the formation of the district. After the district has been formed, the board need not be limited by the provisions of the petition in the amount to be submitted on the bond issue or for whatever improvements may be found desirable.

These provisions of Sec. 3 which deal with the organization of districts give ample opportunity to interested owners to protect their rights, and to prevent the formation of such district where the owners of the majority of the real property based on the assessed valuation thereof object. Even the owner of any real property may object to the inclusion of his property within the district and if his objection is found valid, his property cannot be included since there is a provision that the board of county commissioners shall eliminate any property originally included in the proposed district where it shall determine that the property will not be benefited. Before the district is organized any owner whose property may be affected and who has complied with the provisions of the Act as to written protest may

come into court and have the matter of whether his prop-erty will be benefited or whether the proceedings in estab-lishing the district have been made in compliance with the statute, reviewed by the court. This is due process. See *Patterick* v. *Water Conservancy Dist.*, supra, wherein this court pointed out that a district could have been created by legislative fiat had the legislature so desired, since the creation of a district does not affect property rights, and since the legislature could have created the district by its own fiat it could have provided for a tax on all property within the district to pay for the costs and maintenance of the project; the provision in Section 3 of the act whereby the board is not limited by the amounts or the improve-ments set forth in the petition to establish the district, in the submission of a bond issue after the formation of the district in whatever amounts or whatever improvements it might subsequently find desirable, does not violate the due process clause.

Plaintiff also calls the attention of this court to sections 4 and 5 of this Act, wherein it is provided in part that after the organization of the district 50 real property owners may present a petition to the Board of County Commis-sioners requesting the Board to call an election to determine whether bonds of the district shall be issued to the amount and for the purposes stated in the petition and upon receipt of such a petition the Board shall publish notice of a hear-ing on the petition which notice shall state the amount of the bonds proposed to be issued and whether they are to be general obligations of the district or whether they are to be paid solely from revenue, and the notice should also state the name or number and the boundaries of the dis-trict. At the time of the hearing any interested persons may appear and contend for or protest the calling of the bond election, and any owner of real property may file a written protest against the calling of the election. If prior to the holding of the hearings the owners of more than

50% in value of the real property in the district according to the last assessment roll for county taxes have filed written protests the Board shall not call the election, but if "any written protests are filed and the board shall determine that the protests so filed represent less than half of the assessed valuation of the real property in the district, the resolution or order of the board calling the election shall contain a recital to that effect and such recital shall be binding and conclusive for all purposes."

Plaintiff contends that the provisions of the above sections are of no avail as safeguards to the rights of any interested person even though they provide for notice and hearing and an opportunity to protest since the decision of the board as to its finding is binding and conclusive for all purposes and there can be no recourse to a court to challenge the findings even though they may be inaccurate.

It should be kept in mind that these sections deal only with whether a bond election should be called for the purposes stated in the petition. No individual's life, liberty or property rights are involved. Had the legislature desired, it could have provided that such an election be called by the board itself upon its own determination without taking into account the desires of a certain percentage of property owners, and the due process clause of our constitution would not have been violated had such a statute been enacted. *Patterick* v. *Water Conservancy District*, supra; In re *Bonds of the Madera Irrigation District*, 92 Cal. 296, 28 P. 272, 675, 14 L. R. A. 755. All interested parties have an opportunity to protest the issuance of bonds at the election after it is called by voting against the proposition. If the improvements are not desired or the amount of bonds which it would authorize the board to issue is too much, the voters can voice their displeasure by refusing to give their consent and that would end the issue. However, since the legislature did provide that the election could only be

called by the board upon the happening of certain conditions, these conditions must actually exist if the proposed bond election is to be valid. For instance, if it should be clear, as a matter of fact, that the owners of more than 50% in value of the real property in the district had filed written protests to the calling of the election, and the board, in spite of such apparent fact, should find contrary thereto, the provision that a recital to that effect in the resolution or order calling the election by the board should be final and conclusive for all purposes, would not preclude an interested party who uses due diligence from applying to the courts for a writ to restrain the board from acting beyond the powers granted to it by the legislature. If this were not so, that portion of the Act would be unconstitutional, because it purports to grant certain rights to interested parties, then precludes them from going to a court to enforce them. That the legislature did not so intend is borne out by Sec. 14 of the Act which provides that:

"The board of trustees may provide for the publication of *any* resolution or other proceeding adopted by the board in a newspaper published in or having general circulation in the district. For a period of thirty (30) days after the date of such publication, any person in interest shall have the right to contest the legality of such resolution or proceedings or any bonds which may be authorized thereby or the provisions made for the security and payment of any such bonds, and after such time no one shall have any cause of action to contest the regularity, formality or legality thereof for any cause whatsoever." (Italics ours.)

The above section gives any interested person a right to test the legality of *any* resolution or order of the board, but limits the time for doing so to 30 days after the publication by the board of such resolution or order. Such limitation period does not start to run until after the publication by the board and until the board does so publish and the 30 days have passed any interested person may apply to the courts to test the legality of the board's action.

Plaintiff contends that Section 7 of the Act violates that part of Article 1, Sec. 4 of the State Constitution which provides that: "No property qualification shall be required

of any person to vote, or hold office, except as provided in this Constitution," because that section provides that: "In voting on the question of the issuance of the proposed bonds, none but such qualified voters as shall have paid a property tax in the district in the year next preceding the election shall be permitted to vote * * * ."

Sec. 7 of Art. IV of the State Constitution provides that there shall be no property qualifications for any person to vote or hold office except in elections levying a special tax or creating indebtedness. It is obvious that an election to determine whether bonds should be issued is an election creating an indebtedness and plaintiff concedes that ordinarily property qualifications for voting in such an election would be constitutional. He argues however that since Section 9 of the Act provides that bonds issued may be payable solely from revenue it is unconstitutional to disenfranchise a consumer who might not be a property owner but who would nevertheless be the one to pay the bonds. There is no merit to such contention. A consumer does not pay the bonds, he pays for whatever benefit he receives. If he doesn't receive the benefit he does not pay. The obligor on the bonds is the District. It must pay for it. Its method of procuring revenues to do this does not change that fact nor the fact that the election is for the purpose of creating an indebtedness.

Plaintiff also contends that the Act is unconstitutional because it authorizes counties to exceed their debt limitations. Since a district is not a county but a separate arm of the government distinct from counties or municipalities, the constitutional provisions as to counties do not apply. For the same reason plaintiff's objection to that portion of the Act which allows districts to sell its water outside the district as being a violation of Art. XI, Sec. 6 of the Constitution does not apply as that consti-

tutional provision deals with municipalities.

Plaintiff alleges that the portion of Sec. 8 of the Act which provides that publication of the notice of the bond sale be in a paper of general circulation published in Salt Lake City, Utah, is a special law and therefore violates Art. VI, Sec. 26 and Art. 1, Sec. 24 of our constitution. Plaintiff gives no reason in his brief why he thinks the above provision offends against Art. VI, Sec. 26. This constitutional provision enumerates private laws which the legislature is forbidden to enact but plaintiff fails to point out which, if any of the subsections contained therein this provision violates. Art. 1, Sec. 24 provides that all laws of a general nature shall have uniform operation. Certainly Sec. 8 of the Act applies equally to all districts and unless the provision is unreasonably discriminatory it cannot offend against this provision of our constitution. To be unconstitutional the discrimination must be unreasonable or arbitrary. As stated by Mr. Justice WOLFE in *State* v. *Mason*, 94 Utah 501, 78 P. 2d 920, 923, 117 A. L. R. 330:

"* * * A classification is never unreasonable or arbitrary in its inclusion or exclusion features so long as there is some basis for the differentiation between classes or subject matters included as compared to those excluded from its operation, provided the differentiation bears a reasonable relation to the purposes to be accomplished by the act."

Salt Lake City is the capital of Utah and the newspapers published therein are more likely to reach the notice of persons who might be interested in buying bonds than other newspapers, and thereby accomplish the purpose of the publication more readily. Such a provision is therefore not unreasonable or arbitrary.

We have given due and careful consideration to all of plaintiff's objections to the provisions of the Act which he alleged were unconstitutional and have found no merit to any of them. If there are provisions in the Act which are unconstitutional and to which the atten-

tion of this court has not been called, it will not affect all the provisions of the Act because the legislature has provided in Sec. 16 thereof that: "If any one or more provisions of this law shall ever be held to be invalid for any reason, such holding shall not affect the enforceability of the remaining provisions of this law."

The alternative writ heretofore issued prohibiting the respondents from proceeding to sell bonds under the Act is hereby withdrawn. Writ denied. Costs to respondent.

PRATT, C. J., concurs.

McDONOUGH, Justice.

I concur for the reasons stated in the opinion of WADE, J., as elucidated in the opinion of WOLFE, J.

WOLFE, Justice (concurring in the result).

I concur in the result that Chapter 24, Laws of Utah, is constitutional. Perhaps in a broad sense one may say that the Improvement District Act, Chapter 24, Laws of Utah 1949, is similar to the Metropolitan Water District Act, Chapter 110, Laws of Utah 1935. I think it is somewhat similar to the Water Conservancy Act, Chapter 99, Laws of Utah 1941; Chapter 11, Title 100, U. C. A. 1943. However, there is danger in comparing the structure of districts of different kinds in order to draw conclusions that one is constitutional or unconstitutional because the other was so held. Of course, there is common to the constitution of all districts permitted by law the fact that they are districts —that is, that they are confined to certain areas, and that the functioning of each is related to that area. That is why the word "district" always appears in their title. And common to the objective of forming districts is the principle of democratic cooperation by a majority in number or property value for the purpose to be subserved by the district. But the purposes of each may vary considerably and consequently the nature of the functions and the way they

are constituted correspondingly vary according to the purposes to be effectuated. Its governing body and the procedure by which it may be constituted will likewise be fashioned to effectuate those purposes and functions.

The Metropolitan Water District Act, for instance, is for the purpose of permitting incorporated municipalities to cooperate for the development of water resources which the city or cities were not able to develop without outside aid or cooperation between or among cities, or perhaps to permit a development by a single city which it could not accomplish within its powers or resources.

The organization of Water Conservancy Districts was for the object of permitting individual owners to pool their resources for the purpose of developing water for the benefit of the owners of the lands included in the district. Drainage Districts are also organized for the purpose of pooling the resources of different owners of lands in a certain area with the object of draining and making those lands arable. Irrigation Districts are largely for the same purpose as Conservancy Districts, the latter differing from the former mainly in the magnitude of the projects needed to be constructed to accomplish in one, the major purpose of collecting and preserving water; in the other, the purpose mainly of transporting water to lands. In some of these districts, there is an overlapping of functions because necessity being the mother of invention, Acts are prompted by the particular necessities of certain areas whereas another area may require a more grandiose plan. The outstanding purpose common to all these laws is to permit communities and individuals to do things together to cooperate for their common benefit through organization established under law. It is simply an application of the pervasive principle of cooperation.

While the formation of districts have in common the idea of benefiting individuals or communities, the type of bene-

fits may vary so greatly and the methods of accomplish-
ing those benefits and of raising the money to pay for them
differ so materially, that constitutional questions may be
involved in some which are entirely absent in others. I
mention these matters in order to register caution in at-
tempting to assimilate different types of districts serving
different purposes in order to use the ruling as to one type
on constitutionality as a precedent for another type. In
short, a law designed to establish districts for one purpose
may raise constitutional questions not involved in a law
designed to establish districts for another purpose although
there may be elements common to each.

I had occasion to analyze the meaning and intent of Sec-
tion 29, Article VI of our Constitution in my concurring
opinion in the case of *Lehi City* v. *Meiling, City Recorder,*
87 Utah 237, 48 P. 2d 530. I do not believe I can now ex-
press my conclusions as regards the application of Section
29 of Article VI of our Constitution better than I did at that
time. It was there said 87 Utah at page 274, 48 P. 2d at
page 547:

"Having discussed the meaning of the term 'special commission' without
resort to the extrinsic aid which the purposes which section 29 was intended
to subserve might furnish, we now throw upon those words the illuminating
light furnished by the objects which the section was designed to accom-
plish. One of. the purposes of section 29 appears to be to prevent
the Legislature from interfering with the property and powers of
municipal corporations through some other governmental agency spe-
cially set up for the purpose of doing that. Under the Constitution
counties, cities, and towns are recognized as having a certain amount
of local autonomy. The Constitution sought to leave [to] the Legis-
lature the power of modifying, adding, or subtracting from the powers of
municipal corporations; but such modification, addition, or subtraction of
powers had to be general and could not be done by special legislation. That
is to say, the Legislature could not pass an act specially directed at Salt Lake
City or some other particular municipality. Section 29 was to prevent this
being done indirectly by delegating to some commission certain powers which
in their application might affect one or more cities specially. And, further-
more, to prevent all municipalities from being interfered with by outside
agencies in the construction, management, or operation of their property. If
any public agency, even including a city or town, were given the power
to make, supervise, or interfere with a municipal improvement, municipal

money, municipal property or effects of another city or town, it might be construed, to this extent, to be a 'special commission.' The latter term may therefore take content, not so much from its intrinsic meaning, as from the nature of the powers and duties which are given to it."

Certainly the Improvement District Act did not in itself interfere nor was any entity which could be established under its terms empowered to interfere with the property or power of any municipality.

Further, as stated in the main opinion, the Improvement District Act was not set up as a special act. It was a general law usable by any community to which its provisions are applicable.

While it may be true that this type of district—an entity to accomplish certain purposes—may be set up to exercise within the limited area of the district certain functions which counties may have power to perform within the county but outside of the limits of incorporated cities and towns under Section 19—5—35, 43, 49, 50, 82 and 86, as county functions, I am of the opinion that it is not within the prohibition of Section 29, Article VI of the Constitution reading:

"The Legislature shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, to levy taxes, to select a capitol site, or to perform any municipal functions."

I am not convinced, however, that the county would have the duty or even the power to provide water or sewer systems to settlements within county government territory. The sections above mentioned deal mostly with sanitation and health and regulations connected therewith. Only Sec. 43 gives power to acquire rights in "reservoirs or storage companies or associations *for the use of citizens* of the county; may construct *dams* and *canals* for the storage and distribution of such waters." (Italics mine.) But I have discovered no grant of power to build underground con-

duits for water distribution in a community nor to build sewer systems. These constructions are costly. The county government and its functions are generally designed to police rural, suburban and non-metropolitan territory. Farms or small isolated communities are largely dependent on well water and cesspools or septic tanks for culinary water and sewage disposal respectively.

Chapter 24, Laws of Utah 1949, provides that an improvement district may be constituted for an area within the county not included in any incorporated city or town and function in that area independently of the county through its own officers for the construction, purchase, condemnation or gift of (1) systems for the supply, treatment and disposition of water; and (2) systems for the collection, treatment and disposition of sewage. And it may be that the county itself under its powers over water, health and sanitation has the power to do the same things throughout the county area.

But it should be noted that in order to establish such district, the initiative comes not from property owners within the area but under Section 3 of Chapter 24, by resolution of the Board of County Commissioners. It is only after the district is constituted that three governors (three trustees) are elected with power to operate the systems and to manage them—Section 7, Chapter 24, Laws of Utah, 1949. But it is the Board of County Commissioners which initiates the procedure for the formation of the district and carries it through to conclusion. Until the Board of County Commissioners so moves by resolution, and after notice by advertisement, only then may owners representing more than half of the assessed value of the property in the area protest whereupon "the district should not be established." Since, in this sense, the county retains full control of the decision as to whether there shall or shall not be a district, and then with a veto power by a majority in value of the

ownership of real estate within the district, I am not sure whether the district is an arm of the county or a "separate arm of the government," (if the main opinion means to use "government" as synonymous with "state") or whether it is either, but I do not think that the question need be here determined. I rather think that it is not an arm of either but exercises the powers given it by the law as a separate and independent entity. The metaphor "arm of the state" rather implies an agency of the state and therefore may not accurately reflect the legal concept behind the relationship between the state and an entity erected by its permission or mandate. But the expression has been used to denote an entity exercising governmental functions which the state could exercise. In that sense, an Improvement District may be an arm of the state for limited purposes, but I prefer to say simply that it is a corporation created by an act of the state which permits the county to start the machinery in motion by which it may become a corporation with limited powers. In that sense, it may be an arm of the state. Be that as it may, I am convinced that it is an entity separate from county or state with certain limited independent powers of its own and that is all that need be said. Along that line, it should be furthermore noted that it is the duty of the Board of County Commissioners (but only *after* the creation of the district) upon petition of fifty owners of real property requesting an election for the object of determining whether bonds of the district shall be issued for the purposes stated in said petition, to adopt a resolution, fixing the time and place at which such petition shall be heard and to give notice of the same and to hold a hearing and to entertain objections and if the objections filed at said hearing are not sufficient to prevent the Board from proceeding, to proceed to call a bond election. But the decision as to whether the district shall or shall not be created lies with the Board of County Commissioners. It is only after creation that the Commissioners are required

to act in regard to a bond issue on petition of fifty or more owners of real property. True, a certain area (determined in the resolution of the County Board) may be carved out of the non-corporated part of the county and thus in that sense the financial burden may be shifted from the county as a whole to a limited area granted that the county has the duty and power to construct water and sewer systems for unincorporated towns. But it should be noted in this regard that it would seem only fair that the local property owners who benefit from the improvements should pay for them instead of the property owners of the whole county. I shall have more to say about this hereafter.

The theory behind the act then being sound, it remains to consider whether the separate entity permitted by the Act to be set up is one that Sections 3 and 4 of Article XIV of the Constitution apply to.

An examination of the provisions of Chapter 24, Laws of Utah 1949, reveals that the bonds to be issued, if so specified in the election authorizing the bonds, may provide either that they be paid solely from revenues derived from charges or fees exacted for services rendered or by a levy of taxes on property of the district, or from both sources, Section 9. But in no case may the bonds be made an obligation of the County. They are payable only from revenues derived from service charges or as fees or are general obligations of the district payable out of revenues to be derived from taxation of property in the district depending upon the determination of the voters at the bond election.

In consequence, in no case is the county responsible for their payment. I must conclude, therefore, that the bonds are not the debt of the county but of the district only and that taxes levied against said district property for the payment of the principal of and interest on the bonds can be a lien only against real property in the district. It must follow, therefore, that only the taxpayers in the district are

entitled to vote on the question of a bond issue and not the taxpayers of the whole county. More about this later. No election of the voters of the whole county need be held under the provisions of Section 3, Article XIV of our Constitution.

How is it as respects the debt limit provided for in Section 4 of Article XIV? That limit of county indebtedness is 2% of the assessed value of property in the county and 4% for any "city, town, school district or other municipal corporation." Section 4 of Article XIV further provides that

"any city of the first and second class when authorized as provided in Section three of this Article [Article XIV], may be allowed to incur a larger indebtedness, not to exceed four per centum and any city of the third class, or town, and not to exceed eight per centum additional, for supplying such city or town with water, artificial lights or sewers, when the works for supplying such water, light and sewers, shall be owned and controlled by the municipality."

In the case of *Lehi City* v. *Meiling, supra,* it was determined that a Metropolitan Water District was not a municipal corporation within the meaning of that phrase as used in Sections 3 and 4 of Article XIV, but an Improvement District is an entity under Chapter 24 with powers to cause taxes to be levied for the limited purposes of the district, power to sue and amenability to suit, to make contracts for the benefit of the district, to own and use an official seal and generally to "perform or cause to be performed all acts which in its [the trustees'] opinion are necessary or desirable in the conduct of its affairs and in the operation of the properties of the district." Section 7, Powers of Trustees. Having all the attributes of a corporation of limited powers, it must be considered as such. But that is not to say that it is a municipal corporation as meant by Sections 3 and 4 of Article XIV of our Constitution.

In order to determine the applicability of Sections 3 and 4 of Article XIV of the Constitution, it is necessary to determine whether an Improvement District carved out of non-incorporated county territory is a subdivision of the

county as meant by that term as used in Section 3 of Article XIV.

Mr. Justice Folland in the case of *Lehi City* v. *Meiling, City Recorder,* 87 Utah 237, at pages 256 and 257, 48 P.2d 530, speaking for the court, discussed at some length the nature of the entity known as a "metropolitan water district" in reference to Sections 3 and 4 of Article XIV of the Constitution. Our Metropolitan Water District Act permitted a maximum debt limit of 10% of the value of the taxable property of the district. It was urged there that the 10% statutory limitation imposed on the Metropolitan Water District was in excess of the Constitutional debt limit specified—Section 4 of Article XIV. This court speaking through Mr. Justice Folland held:

"We are satisfied the Metropolitan Water district is not a subdivision of either a city, town, or county within the meaning of the word 'subdivision' as used in the Constitution."

While an Improvement District and a Metropolitan Water District are different types of entities, I believe the reasoning of the court as expounded by Mr. Justice Folland in connection with a metropolitan water district is equally applicable to an improvement district on the question of whether it is an entity subject to the provisions of Sections 3 and 4 of Article XIV, although the districts permitted under that Act were not necessarily confined to a single county. Hence, the question of a part of a county carved out as a district exercising county functions did not arise.

At the time of the adoption of the constitution, the governmental and political divisions were simple. I doubt if districts, as we now know them, for local and particular benefits were in the contemplation of the drafters of our Constitution. An improvement district, for instance, is neither flesh, fish nor fowl. It is a partial city or town—a quasi municipality—in that it is set up to attain certain limited benefits for the district to be served, which benefits

are those which an incorporated city or town could, within their debt limitations, accomplish. They are certainly part of the functions a city or town is eminently fitted to exercise and for which functions they are in part constituted. Back of the legislative acts which made possible the establishment of irrigation, drainage, improvement and mosquito abatement districts and even metropolitan water and water conservancy districts, lay the principle that they who receive the benefits should pay for them. Where the benefits are local, the locality which they are to serve should be given the opportunity to determine by election whether the property owners therein desire the benefits in contemplation and if they elect to have them, the obligation to pay for the bond issues required to construct them should be the obligation of the property owners of the district. Bond issues are a method of borrowing from a number of people to pay for improvements presently to be enjoyed but ultimately those borrowings must be paid either by taxes imposed or by revenues derived from the improvements or both, and it is only fair and equitable that the taxation be laid against those who benefit just as the charges and fees for the services rendered are charged against those who enjoy those services.

It would be very unreasonable to require taxpayers of the whole county to vote for an improvement which was to be confined to and enjoyed by the property owners of a small district. In fact, if the taxpayers of the whole county had to pay for the benefits received by a small part of a county, it is doubtful whether a favorable vote could ever be had. And it would be a most cumbersome method of going about furnishing local communities with improvements if each time the whole county had to vote for the local improvements for the benefit of a small part of the county.

True, the same thing might be accomplished if the inhabitants of the community would, instead of causing an improvement district to be established, incorporate as a city or town as the case might be. In that event, the territory encompassing the city or town would by incorporation be taken out of the county. The Improvement District Act accomplished the same thing as to water and sewer systems by lifting from the county the necessity of furnishing water and sewer facilities, if indeed it ever had that duty, but leaving with the county its ordinary functions in the district area relating to health, policing, etc. And up to the time the improvement district was created, the county had control of the situation because, as above noted, it could refuse to move in the matter of initiating the formation of the district.

I find nothing in the Constitution which prohibits the establishment of local entities in the county designed to confer local benefits on the property owners therein and to provide means to raise funds for their construction from revenue derived from charges for the water and sewer facilities and to permit taxation of the local property receiving the benefits from the improvements. There is nothing in the Constitution which prohibits the legislature from passing a law which permits the creation of instrumentalities designed to perform functions which the county itself might perform, at least if they are local in scope, and this whether we consider that instrumentality an arm of the county or not, and a fortiori if the entity created is considered an arm of the county.

I conclude, therefore, that Sections 3 and 4 of Article XIV of our Constitution are not applicable to improvement districts and therefore the district debt limit is as specified in Section 8 of Chapter 24 under the sub-title "Proceedings on Bond Issue," to wit, 12% of the value of the taxable property of the district. Any of the debt limits

specified in Section 4 of Article XIV of the Constitution are not applicable.

I have given considerable attention to this matter because this is the first time this Act has been before this court for determination of its constitutionality. What we really are asked to do in these cases involving bond issues is to give a declaratory judgment as to validity and constitutionality. The issues should be, if possible, truly adversarial and not a friendly proceeding on fictitious or artificially made issues.

LATIMER, J., concurs in opinion of WOLFE, J.